IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No.

CENTER FOR BIOLOGICAL DIVERSITY
and TAYLOR MCKINNON,

      Plaintiffs

v.

SALLY JEWELL, Secretary of the Interior, and
U.S. FISH AND WILDLIFE SERVICE,

      Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

<u>INTRODUCTION</u>

1.     During the last century, the geographic range and population of Rio Grande cutthroat trout (or "Trout") – the southernmost subspecies of cutthroat trout native to the Rocky Mountains – has declined precipitously.  The Trout no longer occurs in almost 90 percent of its range within Colorado and New Mexico and, as habitat conditions continue to deteriorate, remaining populations continue to shrink in their numbers and distribution.  Most populations are now restricted to small, high-elevation streams and fish cannot migrate between populations because their habitat at lower elevations lack the conditions needed for the Trout's survival. Remaining Trout populations also face continuing threats and recent studies show that climate change is compounding these problems.

2.     Despite these threats and the Trout's decline, Defendants Secretary of the Interior Sally Jewell and the U.S. Fish and Wildlife Service's (collectively "FWS") decided on October 1, 2014 that listing the Rio Grande cutthroat trout as an endangered species or threatened species under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544, is "not

warranted." 79 Fed. Reg. 59,140 (Oct. 1, 2014) (the "Not Warranted Trout Finding"). Previously, from 2008 through at least 2012, FWS determined that the Trout deserved the legal protections available through an ESA listing because the Trout met the definition of an endangered species.

3.     In this lawsuit, Plaintiffs Center for Biological Diversity and Taylor McKinnon challenge FWS's Not Warranted Trout Finding.  That Finding is unlawful for several reasons: FWS failed to determine whether the Trout's lost habitat constitutes a significant portion of range, even though these habitats are critically important to the survival of this species; FWS's analysis of the Trout, including within the Species Status Assessment Report, did not apply the "best scientific and commercial data available," 16 U.S.C. § 1533(b); FWS employed the wrong ESA listing standards when evaluating whether any portion of range is significant and warrants listing the Trout, 16 U.S.C. § 1533(a); 1532(6) & (20); and FWS's conclusions, findings and analysis were arbitrary, capricious and not in accordance with law, 5 U.S.C. § 706. Plaintiffs also challenge FWS's 2014 "significant portion of range" policy (the "SPOR Policy"), 79 Fed. Reg. 37,578 (July 1, 2014), upon which FWS relied in part for the Not Warranted Trout Finding.  FWS's SPOR Policy is contrary to the ESA and prevents the agency from determining whether the destroyed and inaccessible portions of a species' range, no matter how large and important to a species it may be, constitute a significant portion of range, such that the species would qualify for the protections available under the ESA.  Both the Not Warranted Trout Finding and SPOR Policy should be vacated, and FWS should be ordered to issue a new finding on the Trout.

JURISDICTION AND VENUE

4.     The Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g) (ESA), 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 551 *et seq*. (APA).  The requested relief is proper under the ESA, APA and 28 U.S.C. §§ 2201-2202 (declaratory judgment and injunctive relief), and there exists an actual, justiciable controversy between the parties that is continuing and has not been remedied.  Over 60 days have passed since Plaintiffs

sent a notice letter to FWS concerning the agency's Not Warranted Trout Finding and FWS's SPOR Policy.  Plaintiffs' challenge to the SPOR Policy is ripe for review, as it was applied to the Not Warranted Trout Finding well as other ESA listing decisions.

5.      Venue is proper before this District Court pursuant to 28 U.S.C. § 1391(e): members of Plaintiff Center For Biological Diversity and Taylor McKinnon reside in Colorado, Plaintiffs have offices in Colorado, all or part of the alleged violations occurred in Colorado, the Trout occurs in Colorado, and because this is an action against an agency of the United States with offices in Colorado.

PARTIES

6.      Plaintiff Center For Biological Diversity (the "Center") is a non-profit corporation, with offices in Denver and Salida, Colorado as well as other states.  The Center has over 48,000 members in Colorado and New Mexico, as well as throughout the U.S. and the world.  The Center combines conservation biology with litigation and public advocacy to protect imperiled species and their habitats.  The Center also educates its members and the general public regarding the numerous threats facing species and their habitats, such as the Rio Grande cutthroat trout.

7.      The Center's members have a substantial concrete interest in the Rio Grande cutthroat trout and its habitat.  Center members live, work, recreate, fish, study, and engage in photography, fieldwork and education projects in and around the current and former range of the Rio Grande cutthroat trout.  They use and enjoy, and intend to do so in the future, the habitat and larger ecosystem upon which the Trout depends.  On behalf of their members, the Center petitioned FWS in 1998 to list the Rio Grande cutthroat trout under the ESA and have engaged in public actions to advocate for ESA protection for the Trout, including prior litigation.

8.      Plaintiff Taylor McKinnon lives and works in Salida, Colorado.  Mr. McKinnon is a member of the Center.  He hikes, fishes, studies, and engages in photography throughout the habitat of the Rio Grande cutthroat trout in Colorado and New Mexico.  Mr. McKinnon

3

- Complaint for Declaratory and Injunctive Relief -

derives aesthetic, recreational, scientific, spiritual, educational and other benefits from the Trout's existence in the wild.

9.      Actual and concrete injuries to the interests of Center members and Mr. McKinnon are traceable to FWS's conduct in the decision-making process that resulted in the Not Warranted Trout Finding and the SPOR Policy, and the failure to list the Trout under the ESA.  Center members and Mr. McKinnon are adversely affected and aggrieved by FWS's failure to comply with ESA and APA.  The requested relief, including a revised ESA listing decision and the vacatur of the SPOR Policy will redress the injuries to Center members and Mr. McKinnon.  Plaintiffs have no adequate remedy at law.

10.     Defendant Sally Jewell is the United States Secretary of the Interior.  In this capacity, Secretary Jewell has supervisory responsibility over the U.S. Fish and Wildlife Service and has ultimate authority over FWS's compliance with the ESA, including the Not Warranted Trout Finding and the SPOR Policy.  Defendant Jewell is sued in her official capacity.

11.     Defendant United States Fish and Wildlife Service (FWS) is an agency of the United States within the U.S. Department of the Interior and is responsible for implementing the ESA, including the Not Warranted Trout Finding and the SPOR Policy.

LEGAL BACKGROUND

12.     The ESA is a federal statute that "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).  To achieve species conservation, the ESA requires the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id*. § 1532(3).  The ESA's goal is thus to recover species found to be threatened and endangered.

13.     To receive the protection that the ESA affords, FWS must first list a species (or subspecies of fish, wildlife or plants, or "distinct population segment" of a vertebrate fish or wildlife) and as "threatened" or "endangered." 16 U.S.C. § 1533; *see id*. § 1532(16) (defining "species").  A species is "endangered" if it "is in danger of extinction throughout all or a

significant portion of its range." *Id*. § 1532(6).  A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).  Based on these definitions, there are two geographic and two temporal bases for listing imperilled species.  The geographic element ask whether a species warrants listing because of its status "throughout all" of its range or in a smaller "significant portion" of its range.  The temporal element asks whether the species is presently "in danger of extinction" or "is likely to become" endangered.

14.     A species must be listed if FWS finds that any one or more of the following factors are present:

(A)     the present or threatened destruction, modification or curtailment of its habitat or range;

(B)     overutilization for commercial, recreational, scientific or educational purposes;

(C)     disease or predation;

(D)     the inadequacy of existing regulatory mechanisms; or

(E)     other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c).  FWS must analyze these listing factors "solely on the basis of the best scientific and commercial data available … after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A).  This means that FWS cannot deny a species ESA protection by awaiting the development of the best possible data or by requiring conclusive proof of a particular threat or impact.

15.     Any interested person can begin the listing process by filing a petition to list a species with FWS. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).  Upon receipt of a petition to list a species, FWS has 90 days to review the information submitted and make a finding as to whether that petition presents "substantial scientific or commercial information indicating that

the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1).

If the petition is found to present substantial information, FWS publishes this preliminary finding

in the Federal register and initiates a "status review" of the species. 16 U.S.C. § 1533(b)(3)(A).

A second finding is due within twelve months of the date of petition receipt.  FWS must make

one of three findings: (1) the petitioned action is warranted; (2) the petitioned action is warranted

but presently precluded by other pending proposals for listing species; or (3) the petitioned action

is not warranted. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).  If FWS determines that

listing is not warranted, the listing process concludes and the species receives no protection

under the ESA.

16.     If FWS finds that the listing of a species is warranted, FWS must then publish, in

the Federal Register, a proposed rule to list such species as endangered or threatened. 16 U.S.C.

§ 1533(b)(5).  If listing the species is found to be warranted but precluded by higher priority

listing actions, FWS is required to revisit the status of the species annually and issue new

findings updating the species' status. *Id*. § 1533(b)(C)(i).

17.     Once a species is listed as endangered or threatened, the ESA's procedural and

substantive provisions operate to protect a species from harmful activities and aid in their

recovery. *See e.g.*, 16 U.S.C. §§ 1533(f) (preparing and implementing recovery plans),

1536(a)(2) (undergoing consultation procedures to avoid jeopardizing species and adversely

modifying critical habitat), and 1538(a)(1)(B) and (G) (application of the "take" prohibition).

- Complaint for Declaratory and Injunctive Relief -

**BACKGROUND**

I.      THE NOT WARRANTED TROUT FINDING

      A.      Rio Grande Cutthroat Trout

      18.     Cutthroat trout gets their name from crimson stripes on the underside of their jaw. The Rio Grande cutthroat trout – a subspecies of cutthroat trout – lives and thrives in clean, cool mountain streams.  It requires water with a high dissolved oxygen content, low water temperatures in the summer, deep pools to avoid freezing in the winter and drying in the summer, and clean gravel for spawning.  Streamside vegetation is needed to provide shade, protective cover, and sources of food.  For populations to persist, trout must be able to disperse to and from high elevation streams during stochastic events and when habitat conditions deteriorate.  Spring spawning is tied to water temperatures, and the timing and quantity of runoff.

      19.      Several subspecies of cutthroat trout survive in the western United States.  The Trout is the southernmost subspecies of cutthroat trout, with its range stretching from south-central Colorado, through New Mexico, to the Mexican border.  The Rio Grande cutthroat trout is the state fish of New Mexico.  Anglers prize the Trout as a symbol of the west and its beauty.

      20.     Like nearly all of its native cutthroat trout cousins, the geographic range of the Rio Grande cutthroat trout has shrunk severely, and the Trout now occupies only a small portion of its range (approximately 10 percent).  No viable population currently lives south of Santa Fe, New Mexico.  The Trout's distribution within this reduced range is limited, as is the subspecies' population size as a whole and within the remaining populations.

      21.     Not only has the Trout's range contracted, but the habitat that remains is not sufficient to sustain the Trout's remaining populations.  Most problematic to the species' survival is that the lower elevation rivers that previously connected populations and provided refuges

7

from drought, fire and extreme cold are currently uninhabitable.  Remaining Trout populations are now restricted to short, shallow, and narrow segments of headwater streams, mostly above 8,000 feet in elevation within the Rio Grande, Pecos, and Canadian River watersheds in Colorado and New Mexico.  This habitat loss means that remnant populations are isolated from one another.  Remaining populations are small in size.  Numerous factors have destroyed and continue to threaten the trout's habitat, including water diversions, livestock grazing, logging, mining, roadbuilding, wildfires and drought.  Whirling disease and non-native fish have resulted in significant population reductions as well.  Recent evidence shows that climate change is exacerbating these existing threats to the Trout.

      B.    <u>Listing Petition and Initial FDWS Findings</u>

    22.    The Center submitted to FWS an ESA petition to list the Trout on February 25, 1998.  In response, FWS issued its preliminary finding on September 14, 1998 – determining that the petition did not contain sufficient information indicating that listing may be warranted. 63 Fed. Reg. 49,062 (Sept. 14, 1998).  On June 9, 1999, the Center and others filed a lawsuit challenging this negative preliminary finding.  The lawsuit settled on November 8, 2001 when FWS agreed that listing "may be warranted" – reversing its earlier preliminary finding.  As part of the settlement, FWS agreed to (1) initiate a status review of the Trout and (2) determine whether the Trout warrants listing as an endangered or threatened species under the ESA.

    23.    On June 3, 2002, after conducting the required status review, FWS concluded that listing of the Trout was not warranted. 67 Fed. Reg. 39,936 (June 3, 2002).  This finding was based on the fact that 13 "core" populations of Trout were surviving, which, according to FWS, meant the species was viable.  These so-called core populations were genetically "pure" (less than 1% of their genetic markers were from other cutthroat trout or rainbow trout), occupied

streams of sufficient length, were of an adequate population size, and were secured from non-native trout.  While relying on the 13 core populations, FWS conceded that 99 percent of the habitat within the Trout's range had been destroyed, and 254 of 267 populations (the non-core populations that remained) would not survive long-term.  The Center filed a second lawsuit against the 2002 decision, which settled when FWS agreed to reconsider the Trout's status and issue a new listing determination.

C.    2008 Warranted But Precluded Finding

24.    In response, on May 14, 2008, FWS determined that listing the Trout was warranted, although the agency would not list the species because other ESA listing actions were deemed to be higher priority actions. 73 Fed. Reg. 27,900 (the "Warranted Finding").  The Warranted Finding meant that the Trout was placed on the "candidate" list and a listing proposal would be completed as funding and priorities permitted.  It required FWS to review the Trout's status and issue similar decisions annually. *See* 16 U.S.C. § 1533(b)(3)(C).

25.    In the Warranted Finding, FWS identified several reasons why the Trout now warranted ESA listing, highlighted by the fact that there has been a significant loss of range (90%) and threats were continuing to adversely impact the species. 73 Fed. Reg. 27,900.  FWS reasoned that the Trout's range had contracted northward and that remaining populations were restricted to high-elevation headwater streams.  The agency explained that the Trout was threatened by habitat fragmentation and isolation, small population size, the presence of nonnative fish, whirling disease, poor habitat conditions, fire, drought, and the effects of climate change.  FWS emphasized the significance of habitat fragmentation and climate change, which exacerbate all known threats.

26.     In the Warranted Finding, FWS explained that its changed opinion from its 2002 determination was due, in part, to the status of the 13 core populations: one population that contained over 13,000 fish in 2002 had been completely extirpated due to a lack of water, and only five of the 13 populations continued to satisfy the previously-used criteria to define a core population. 73 Fed. Reg. at 27,901, 27,904.  Significantly, whereas all 13 populations had at least 2,500 fish in 2002, by 2008, five had fewer than 1,000 and three had fewer than 2,000 individuals. *Id*.  FWS also found that the existence of an isolated population did not ensure long-term persistence. *Id*. at 27,901.  In short, these 13 core populations were not sufficient to conserve the Trout

27.     The failing status of the core populations resulted in FWS redefining a Trout population.  Instead of the 99 percent genetically pure criterion FWS used in 2002, fish found to be only 90 percent pure were sufficient to be called a "conservation" population." 73 Fed. Reg. at 27,901-02.  At the time of the 2008 Warranted Finding, FWS claimed that there were 120 conservation populations, although they were all located in isolated headwater streams that were above 9,000 feet. *Id*. at 27,903, 27,902.  Only 15 of these 120 conservation populations had at least 2,500 individuals – the population size FWS deemed necessary to ensure long-term persistence. 73 Fed. Reg. at 27,904.  Based on this minimum population size and two other criteria (adequate stream lengths and the absence of non-native trout), FWS found that only eight of the 120 conservation populations were viable. *Id*. at 27,905.

28.     FWS reviewed threats to these 120 conservation populations. 73 Fed. Reg. at 27,907.  The vast majority of them (97%) were subject to the ongoing threats (*id*. at 27,921): 90 percent by recreation activities; 87 percent by grazing; 58 percent by roads; 19 percent by logging; 17 percent by dewatering; and 3 percent by mining. *Id*.  In the Warranted Finding, FWS

- Complaint for Declaratory and Injunctive Relief -

also considered how climate change affected the status of the conservation populations, finding climate change will cause existing threats to accelerate in their effect.  For example, climate change will exacerbate the harms resulting from increased water temperature, decreased water supply, a changed hydrograph (earlier spring run-off), and extreme events, such as floods, drought, and fire, which will occur more frequently and with greater intensity. *Id*. at 27,913-19. FWS concluded that while the degree of harm from climate change is uncertain, "even a minimal increase in temperature will lead to increased habitat unsuitability and will exacerbate most other known threats to the subspecies. *Id*. at 27,919.

29.     FWS defined "foreseeable future" for the Trout – the time period in which a species listed as threatened is likely to become endangered (16 U.S.C. § 1532(20)) – as 20 to 30 years.  The chosen timeframe equates to 4 to 10 generations and accounts for changes in species management due to social and political changes.  It attempts to ensure that the dynamics in life history and ecological adaptions are viewed sufficiently.

30.     On November 6, 2012, FWS confirmed the Warranted Finding, citing the same threats and degree of threats to the Trout.  The agency reiterated that almost 90 percent of the Trout's range had become uninhabitable and remaining habitat was so highly fragmented that 93 percent of the conservation populations were isolated in high-elevated streams, which threatened these remaining Trout populations.  FWS further determined that 71 percent of the conservation populations occur in small stream segments, which limits the type of habitats that area available and the size of each populations, and that 38 percent of the conservation populations share habitat with nonnative trout that compete with, predate upon and hybridize with the Trout.  In short, the Trout's status had not improved since the 2008 Warranted Finding.

- Complaint for Declaratory and Injunctive Relief -

D.      2014 Not Warranted Trout Finding

31.     On September 9, 2011, FWS settled a lawsuit wherein the agency agreed to assess all "candidate" species that warranted listing but were precluded but limited funding, including the Trout.  According to the settlement, FWS's evaluation of these species would result in either a decision to list the species as endangered or threatened by publishing a proposed rule to list, or remove the species from the candidate list upon finding that listing was not warranted.

32.     In accordance with the settlement, in late 2012, FWS began evaluating the Trout with the intent to make a new listing decision by September 30, 2014.  The Trout would be evaluated based on the agency's new listing protocol.  FWS would first prepare a scientific document, known as a "species status assessment," and then use that biological analysis to determine whether the Trout warrants listing as either an endangered or threatened species.

33.     FWS completed the Trout's Species Status Assessment on September 15, 2014. Therein, FWS evaluated the life history and biological needs of the Trout and habitat management by public agencies and private landowners.  FWS also reviewed current conditions of the Trout's 122 conservation populations and the existing factors that threatened the Trout overall – there was no analysis that assessed threats to each conservation population.  The Species Status Assessment discussed the Trout populations based on Geographic Management Units, through which remaining populations are grouped by the watersheds in which they exist – Rio Grande, Pecos, Canadian, and Lower Rio Grande.  While a convenient management tool, nothing about the Geographic Management Units differentiates them from one another – there are no important genetic differences or ecological variations, except that the number of populations within each GMU varies.

34.     The Species Status Assessment's primary purpose was to determine the Trout's "viability."  Generally, viability means that the species will persist in the wild and not go extinct within a selected timeframe.  FWS evaluated three viability factors: resiliency, representation and redundancy.  "Resiliency" is based on the size and connectivity of populations.  "Redundancy" is reflected in the number and distribution of Trout populations within each GMU.  "Representation" addresses the variation in genetic makeup and ecological conditions needed to adapt to changing environmental conditions.  The Species Status Assessment describes these factors very generally, and does not articulate what these threshold conditions mean for the Trout.  For example, the Species Status Assessment does not articulate a threshold population size for each conservation population or a suitable number of populations.  The Assessment states that the Trout is viable, although there will be significant reductions in the distribution and population size of the conservation populations.

35.     Although FWS published its listing decision on October 1, 2014 (79 Fed. Reg. 59,140), the agency decided that ESA listing of the Trout was not warranted on April 18, 2014.  That determination was made before the scientific analysis set forth in the Species Status Assessment was completed on September 15, 2014.

36.     The Not Warranted Trout Finding described the status of the 122 remaining populations.  FWS categorized the status of the 122 populations based on their present condition, accounting for population size, the length of the stream where the population is found, and the presence of nonnative trout.  FWS's assessment of current status did not account for the fact most populations (106 of 122) are isolated from each other due to habitat fragmentation.  FWS also reviewed some factors that continue to threaten the conservation populations.  But FWS dismissed certain threats that previously were considered to be significant threats, including

- Complaint for Declaratory and Injunctive Relief -

hydrologic changes due to climate change, land management activities, and fishing. 79 Fed. Reg. at 59,142.

37.     FWS's Not Warranted Trout Finding was based, in part, on whether each conservation population satisfied an "effective" population target size.  Effective population size is a metric based on a set of criteria designed to ensure a species' long-term survival.  The effective population size that FWS used for the Trout was based on factors not particular to the Trout.  For every prior Trout ESA-listing decision, FWS assessed whether a population was of a sufficient size based on the existence of 2,500 individual fish.  FWS did not explain why it was changing how it gauged the existence of a sufficiently large population in the Not Warranted Trout Finding from the method it had used previously.

38.     In the Not Warranted Trout Finding, FWS claimed that much of the Trout's habitat and population losses are due to the introduction and presence of nonnative trout over the last 50 years. 79 Fed. Reg. at 59,145.  FWS states that these declines are expected to stop because nonnative stockings are now limited and existing nonnative trout populations are being managed. *Id*.  This is a changed depiction of the Trout's status from prior ESA-listing decisions. In 2008, FWS stated that the same losses of habitat and populations occurred over the last 200 years due to not only to nonnative trout, but also years of continued habitat degradation. 73 Fed. Reg. 27,921.  In 2012, FWS stated that water diversions, stream drying, dams, habitat degradation, changes in hydrology, and nonnative trout caused habitat and population losses over 150 years.  FWS does not explain in the Not Warranted Finding why habitat degradation, along with nonnatives, is no longer considered a threat to the Trout, or why FWS claims all habitat and population losses occurred just in the last 50 years.

- Complaint for Declaratory and Injunctive Relief -

39.     FWS's Not Warranted Trout Finding also relies on management actions by public and private land managers.  In 2013, FWS approved a plan for Trout habitat located on private lands that straddle the New Mexico-Colorado border. 78 Fed. Reg. 43,912.  The Vermejo Park Ranch Candidate Conservation Agreement with Assurances has proposed to restore habitat that would connect previously isolated Trout populations found within 120 miles of the Rio Costilla watershed.  Vermejo Park Ranch agreed to implement restoration actions in exchange for a permit to "take" Trout and conduct land uses that may adversely affect Trout habitat. Previously, in 2000, fish barriers had been constructed on this property.

40.     Also in 2013, Colorado, New Mexico and federal land managing agencies completed an "updated" Conservation Agreement and Strategy (Conservation Strategy).  The Conservation Strategy was initially developed in 2003, and renewed and updated in 2009.  The 2013 version of the Conservation Strategy did not change the actions that had been adopted in prior versions.  For example, the 2003 version contained a promise to establish between 11 and 20 new populations within the Trout's range over a 10-year period.  From 2003 through 2013, the signatories to the Conservation Strategy had not established 11 to 20 new populations.

41.     FWS did not provide notice and an opportunity to comment on the Not Warranted Trout Finding.  The Not Warranted Trout Finding represented a changed position on whether the Trout warranted ESA listing. 79 Fed. Reg. at 59,145, 59,142.

II.     THE SPOR POLICY

42.     On March 16, 2007, lawyers for the Department of the Interior issued a Memorandum Opinion evaluating the meaning of the phrase "significant portion of range." M-37013, "The Meaning of 'In Danger of Extinction Throughout All or a Significant Portion of Range'" (March 16, 2007); *see* 43 U.S.C. § 1455; Departmental Manual, Part 209, § 3.1, §

3.2(A)(11) ("M-Opinions … shall be binding, when signed, on all other Departmental offices and officials").  The M-Opinion determined that the word "range" in the "significant portion of range" refers to the geographic areas where the species currently exists, and not the portions of range where it no longer lives.  In doing so, department lawyers ignored controlling precedent, which held that FWS "must at least explain the conclusion that the area in which the species no longer live is not a significant portion of range." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).  The M-Opinion also conflated the two geographic standards for listing – "throughout all" and "significant portions" of range.  That too had been rejected in *Defenders of Wildlife*.  On May 18, 2009, the Ninth Circuit Court of Appeals reaffirmed its legal conclusions from *Defenders of Wildlife*, thereby rejecting the interpretations found in the M-Opinion. *See Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 876 (9th Cir. 2009).  The court reiterated that the two listing standards are distinct and both provide a basis for an ESA listing, and that lost range can be a significant portion of range that warrants ESA listing.

43.     The M-Opinion was withdrawn in May 2011, due to the *Tucson Herpetological Soc'y* ruling, as well as two district court decisions: *Defenders of Wildlife v. Salazar*, 729 F.Supp.2d 107 (D. Mont. 2010), and *WildEarth Guardians v. Salazar*, 2010 WL 3895682 * 3-6 (D. Ariz. Sept. 30, 2010).

44.     On July 1, 2014, FWS issued a final SPOR Policy, after releasing a draft policy in December 2011 and undergoing a public comment period. 79 Fed. Reg. 37,578 (July 1, 2014). Relevant here, the SPOR Policy attempts to define the meaning of two aspects of the "significant portion of its range" clause: what is a species' "range" for the purpose of an ESA listing decision; and how FWS will decide whether a portion of range is a "significant portion."  The interpretations offered in the SPOR Policy closely follow those found in the 2007 M-Opinion:

(1) a significant portion of range cannot include lost range and refers only to the species' range that exists at the time of the listing decision; and (2) a portion of range is only significant if it renders a species in danger of extinction throughout all its range. *Id*. at 37,579.  The SPOR Policy also states that FWS will not apply the "significant portion" standard if it has determined that the species warrants listing based on the throughout-all-its-range standard. *Id*. at 37,580.

<u>FIRST CLAIM FOR RELIEF</u>
(FWS's Not Warranted Trout Finding Violates The ESA and APA)

45.  Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

46.  FWS has a mandatory duty to list the Rio Grande cutthroat trout where it is in danger of extinction "throughout all" or in a "significant portion" of its range due to the presence of any of the five listing factors. 16 U.S.C. §§ 1532(6), 1532(10), 1533(a)(1).  This decision must be based solely on the best scientific and commercial data available. 16 U.S.C. § 1533(b)(1)(A).

47.  The Not Warranted Trout Finding and Species Status Assessment fail to rely on the best scientific and commercial data available.  FWS also failed to evaluate the remaining Trout populations based on the five ESA listing factors.  FWS employed factors beyond those in the ESA and changed the criteria it used throughout the Trout's listing process, including most recently in the 2012 Status Assessment.

48.  The Rio Grande cutthroat trout no longer exists in almost 90 percent of its range. The Trout's lost range includes all lower elevation waterways, which (1) prevents Trout from migrating from one habitat area to another, rendering it more vulnerable to stochastic events, and (2) restricts the Trout to high elevation streams where habitat conditions are poor and limited. The Trout's lost range is a significant amount of its range and significant to the species biologically.  FWS's Not Warranted Trout Finding did not consider whether this lost habitat, alone or in combination with the Trout's status in its remaining range, warrants ESA listing of the Trout because it is a "significant portion of range."  The ESA requires FWS to inquire whether any portion of range, including lost range, amounts to a significant portion of range. *See*

16 U.S.C. § 1532(6) & (20).  Under FWS's SPOR Policy, the portions of range that must be evaluated for significance are those that are subject to unique or different threats than other portions of range. *See* 79 Fed. Reg. at 59,148.  The Trout's lost range is unique and suffers from threats that are distinct from those found in the Trout's remaining range and therefore had to be evaluated for significance under the SPOR Policy.

49.     Further, FWS failed to consider the threat posed by lost range to the populations and habitat in the Trout's remaining range.  The ESA listing factors require FWS to consider lost range, because Factor A involves assessing "the present…curtailment of [a species'] habitat or range." 16 U.S.C. § 1533(a)(1)(A).  FWS's SPOR Policy also calls on FWS to assess the effects of lost range on remaining populations and range. 70 Fed. Reg. at 37,583.  Without the Trout's lost lower elevation habitat and range, remaining populations and current habitat areas are shrinking, isolated and fragmented, at risk and some of these isolated populations have in fact been extirpated or significantly reduced in size.

50.     The Not Warranted Trout Finding also does not comply with the significance analysis set forth in the SPOR Policy.  Under the SPOR Policy, a remaining portion of range will not be assessed for its significance if that portion is not unique to the species or threats are uniform throughout that portion of range. *See* 79 Fed. Reg. at 59,148.  FWS identifies four specific "portions" of range based on watersheds, referred to as the Rio Grande, Lower Rio Grande, Pecos and Canadian Geographic Management Units or GMUs.  Each watershed faces the same threats, and none of the GMUs contains Trout that are genetically distinct or exhibits unique ecological conditions.  Based on the SPOR Policy's criteria for portions of range that may be significant, none of the GMUs would qualify as a significant portion.

51.     FWS's application of the "significant portion" standard to the Trout conflates that standard with the "throughout all" standard.  FWS assessed a watershed's significance based on the number of populations found there.  The Not Warranted Trout Finding determined that two of the GMUs satisfied the threshold for significance: the Rio Grande Headwaters GMU and Lower Rio Grande GMU. 79 Fed. Reg. 59,148.  This finding was entirely based on the fact that

the Rio Grande Headwaters contained 41 of the 122 remaining populations and the Lower Rio Grande GMU had 59 populations. *Id*.  FWS also combined some the GMUs and found them significant too based on the percentage of their populations compared to all remaining populations. *Id*. at 59,149.

52.     For each portion (GMU or combination of GMUs) that FWS found to be significant, the agency determined that none warranted listing the Trout. *Id*. at 59,148-49.  FWS explained that in no scenario would all the populations in the analyzed "significant portion" go extinct and therefore none was endangered or threatened. *Id*.  In doing so, FWS made inconsistent findings: it found first that the portion was significant because its loss threatened the Trout throughout all its range, *id*. at 59,148, but then found that none of these significant GMUs warranted listing because "the subspecies" as a whole would not go extinct. *Id*. at 59,148 (finding that because the Rio Grande GMU "provides resiliency, representation and redundancy *for the subspecies* in the Rio Grande Headwaters GMU, we conclude the subspecies does not meet the definition of an endangered species [or threatened species]") (emphasis added).  In essence, applying its SPOR Policy, FWS equated the two ESA listing standards – throughout all its range and a significant portion of its range – in assessing the Trout, violating the ESA.

53.     Before the Not Warranted Trout Finding, FWS maintained consistently that the Trout warranted ESA listing.  Four years after its 2008 Warranted Finding, FWS determined in its 2012 Status Assessment that threats to the Trout had not changed and this species continued to warrant listing.  The 2008 Warranted Determination and 2012 Status Assessment relied on factual findings about threats to the Trout and the inadequacy of efforts to address these known threats, including the Conservation Strategy.

54.     FWS's position changed in the Not Warranted Trout Finding, but did so without a reasoned explanation.  FWS changed its opinion despite no new evidence suggesting that the Trout's status had improved and no new regulatory mechanisms that alleviated known threats to the Trout.  The Conservation Strategy had not changed since FWS's prior listing determination on the Trout.  The 2014 Species Status Assessment contained the same science and data

19

concerning the trout's status and threats as did the 2012 Status Assessment.  FWS changed its position despite the agency's recognition that climate change, as was the case in 2012, exacerbates known and ongoing threats to the Trout.

55.     In the Not Warranted Trout Finding, FWS violated the ESA by failing to comply with mandatory duties set forth in ESA section 4, within the meaning of section 11(g)(1)(C) of the ESA. 16 U.S.C. § 1540(g)(1)(C).  FWS's Not Warranted Trout Finding is arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA. 5 U.S.C. § 706(2).

SECOND CLAIM FOR RELIEF
(FWS's Significant Portion of Range Policy Violates the ESA)

56.     Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

57.     The SPOR Policy defines "range" in a manner that is not consistent with the ESA's plain language.  In contrast to the statute, which does not limit the meaning of "range" in any way, FWS's Policy restricts the meaning of the term "range" to current range only.  The Policy interprets range to mean only the "geographical area within which the species is currently found." 79 Fed. Reg. at 37,583.  Current range is further refined "to be the range occupied by the species at the time the Service [FWS] makes a [listing] determination." *Id*.  Under the SPOR Policy, a species' lost habitat range – no matter how much has been lost and regardless of how significant that loss may be – cannot, itself, result in the listing of a species.  That is, lost range is not part of a species range for the purpose of ESA listings.  Where Congress intended to distinguish between remaining habitat areas and former habitat areas, it did so. *See, e.g.*, 16 U.S.C. § 1532(5) (defining critical habitat to mean either "the specific areas within the geographical area occupied by the species at the time it is listed" and "specific areas outside the geographical area occupied by the species at the time it is listed").  The SPOR Policy thus precludes a determination that lost range, alone or in combination with the species' status within its remaining current range, can be a significant portion of range.

58.     Under the SPOR Policy, FWS will consider the effects of lost range on a species' viability in its remaining range. 79 Fed. Reg. at 37,583-84 (sole manner that historical range is evaluated is to consider "the effects that loss of historical range may have on the current and future viability of the species").  The ESA's listing factors make consideration of lost range and the threats it imposes mandatory. 16 U.S.C. § 1533(a)(1)(A) (requiring FWS to evaluate "the present or threatened destruction, modification, or curtailment of its habitat or range").  Yet that is not the same, as FWS makes clear, as determining whether "lost historical range is itself an SPR [significant[ portion of range]." *Id*. at 37,584; *id*. at 37585 ("conclud[ing] that the status of lost historical range should not be separately evaluated").  Under the SPOR Policy, FWS is foreclosed from asking the relevant legal question of whether lost range constitutes a "significant portion" of a species' range.

59.     The SPOR Policy further defines the meaning of the term "significant" as it qualifies a "portion" of a species' range. 79 Fed. Reg. at 37,580-83.  Under the Policy's definition, a portion is significant only if the loss of that portion renders the species "so impaired that the species would have an increased vulnerability to threats to the point that the *overall species* would be in danger of extinction." *Id*. at 37,582 (emphasis added).  Stated another way, significance means that "the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction [endangered], or likely to become so in the foreseeable future [threatened], *throughout all its range*." *Id*. 37,5780 (emphasis added).  As a consequence of the SPOR Policy's interpretation of significant portion, the two distinct ESA listing standards – "throughout all" and "significant portion" – are conflated and "significant portion" has no independent meaning.

60.     FWS notes that a species' current range can be carved up into an infinitesimal amount of portions. 79 Fed. Reg. at 37,586.  To avoid the problem of evaluating unworthy portions of range for significance, FWS will not undergo a significant portion of range analysis "if the threats to the species are affecting it uniformly throughout its range." *Id*.  Regardless of whether threats are uniform or a lack of biological differences exist within a portion of range, the

loss of any portion, including a lost portion, can be significant.

61.     FWS defined "significant" based on policy considerations, and not, as the ESA requires, based on the best scientific and commercial information available.  FWS intended that "the threshold for significance be high enough to avoid dilution of conservation efforts and unnecessary restrictions that may result from listing a species based on its status throughout an SPR." 79 Fed. Reg. at 37,581.  FWS was motivated to set a high standard for satisfying the "significant portion" threshold because the ESA requires listing the entire species, even if only a significant portion is in danger or likely to become so, and having the ESA's protections apply across its range. *Id*. at 37,579.  FWS's criteria for significance are not based on the best available science.

62.     The SPOR Policy also set forth how FWS will conduct its analysis of an imperiled species under the two listing standards.  If a species is found to be endangered or threatened throughout all its range, FWS will forego undertaking an analysis of whether it is endangered or threatened in a significant portion of range.  In this respect, the SPOR Policy violates the plain language of the ESA.

63.     On its face, the SPOR Policy violates the ESA, and is also arbitrary and capricious, an abuse of discretion and not in accordance with law. 5 U.S.C. § 706(2).

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1.     Declare that FWS's Not Warranted Trout Finding violates the ESA and is arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law;

2.     Declare that FWS's SPOR Policy violates the ESA and is arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law;

3.     Order FWS's Not Warranted Trout Finding and SPOR Policy vacated, and enjoin FWS from relying and applying the SPOR Policy and its interpretations of the ESA in considering whether to list under the ESA the Trout or any other species;

- Complaint for Declaratory and Injunctive Relief -

4.     Order FWS to initiate within 60 days a new ESA rulemaking process on the Rio Grande cutthroat trout and issue a new listing determination on the Trout within nine months;

5.     Award Plaintiffs their costs, including reasonable attorneys' fees; and

6.     Grant Plaintiffs such further relief as may be necessary and appropriate or as the Court deems just and proper.

Respectfully submitted,

Dated: July 29, 2016                    /s/ Neil Levine
                                         Neil Levine (CO Bar No. 29083)
                                         Law Office
                                         4454 Tennyson Street
                                         Denver, Colorado 80212
                                         (303)-455-0604
                                         nlevine@grandcanyontrust.org

                                         John Buse (CA Bar No. 163156)
                                         Center For Biological Diversity
                                         1212 Broadway, Suite 800
                                         Oakland, CA 94612
                                         (510) 844-7125
                                         jbuse@biologicaldiversity.org

                                         Attorneys for Plaintiffs
                                         *Center for Biological Diversity and Taylor McKinnon*

- Complaint for Declaratory and Injunctive Relief -